J-A02022-25

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| IN RE: ADOPTION OF: S.R.S., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| APPEAL OF: M.B., FATHER | : | |
| | : | |
| | : | No. 1087 WDA 2024 |

Appeal from the Order Entered August 1, 2024
In the Court of Common Pleas of Westmoreland County Orphans' Court
at No(s):  007 of 2024

BEFORE:  KUNSELMAN, J., MURRAY, J., and BECK, J.

MEMORANDUM BY MURRAY, J.:                    **FILED: January 28, 2025**

M.B. (Father) appeals from the order granting the petition filed by the Westmoreland County Children's Bureau (the Agency or WCCB), and involuntarily terminating Father's parental rights to S.R.S. (a daughter born in December 2020) (Child).[1]  Upon careful review, we affirm.

A prior panel of this Court[2] summarized the underlying factual and procedural history:

_____

[1] The trial court also involuntarily terminated the parental rights of Child's biological mother, C.O. (Mother).  Mother did not appeal.

[2] Discussed further, *infra*, in **Int. of S.S.**, 480 WDA 2024 (Pa. Super. 2024) (unpublished memorandum), Father challenged the trial court's April 1, 2024, dependency order suspending Father's visitation with Child, as well as the trial court's determination that WCCB properly denied Father's proposed kinship foster placement.  **Int. of S.S.**, 480 WDA 2024 (unpublished memorandum at 1, 3).  On October 8, 2024, we affirmed the trial court's order, and denied Father relief.  **Id.** (unpublished memorandum at 17).

Child was born in December 2020. [WCCB] obtained emergency protective custody of Child when Child was three months old. Order for Emergency Protective Custody, 3/30/21, at 1. Child had been diagnosed with "failure to thrive." *Id.* At the time, [Father] was not a party to the case. Child resided with [Mother], who lacked stable housing, and "stay[ed] between [the homes of] maternal uncle and maternal grandmother." *Id.* On March 30, 2021, the court ordered that Child be placed in foster care.[3] *Id.*

On May 7, 2021, the [trial] court adjudicated Child dependent. In July 2021, when Child was six months old, [Father] was joined as a party to the case after a paternity test established that he is Child's biological father. *See* [Father's] Brief at 5. The court, *inter alia*, ordered that [Father] have supervised visitation with Child. After a review hearing in November 2021, the court found:

> There has been moderate compliance with [Father's] permanency plan in that [Father] began supervised visits on August 6, 2021 ([he attended] six of seven [visits]). [Father] has a mental health history, but denies drug and alcohol or domestic violence issues.... [Father] does hands-on parenting and curriculum. [Father] was indicated for [committing sexual] abuse three times … when he was 13 [years old], so psychosexual evaluation must be done. …

Order, 11/17/21, at 1.

After a review hearing in May 2022, the [trial] court determined:

> [Father] sometimes fails to follow-up with parenting instruction. [Father completed a] psychosexual assessment and needs treatment. [Father] attended 34 of 41 offered visits. [Father] cannot manage his anger, [and] continues to fight/bicker with Mother … despite repeated discussions with [service] providers to avoid [conflict].... [Father] needs [to be] prompted to attend to [C]hild's cues and has difficulty de-

---

[3] Although originally placed with a different foster family, Child has remained with the current foster family since January 2023.

> escalating [his] anger. [C]hild often does not want to go to [Father] – she cries. On April 2, 2022, [a] psychiatric evaluation [diagnosed Father with] Autism[ and attention deficit hyperactivity disorder (ADHD), [and recommended mental health services].

Order, 5/5/22, at 2.

> [Father] had supervised visits with Child for approximately two and a half years. On January 10, 2024, the [trial] court held a review hearing, "and due to the lengthy testimony," the hearing was scheduled for a second day of testimony on March 22, 2024. [Trial] Court Opinion ([T]CO), 4/29/24, at 1. By order entered April 1, 2024, the [trial] court suspended [Father's] visits. The order states:

>> It has been determined that visitation with [Father] is contrary to the safety or well-being of Child. Specifically, the therapist[, Margaret Ferguson (Ms. Ferguson),] testified that continuing visits with [Father] would be harmful to [C]hild. After visits, [C]hild demonstrates self-harming behavior and has nightmares. [C]hild also struggles with sleeping and wetting the bed after visits.

> Order[, 4/1/24,] at 3. The court noted Ms. Ferguson's "lengthy testimony," that "[m]ore recent visits have presented more concerning behavior" by Child. [T]CO[, 4/29/24,] at 2-3. Specifically, the court "determined through clear and convincing evidence that continuing visits created a grave risk of emotional harm to [C]hild and visits with [Father] should be suspended." *Id.* at 4.

*Int. of S.S.*, 480 WDA 2024 (Pa. Super. 2024) (unpublished memorandum at 1-3).

In the interim, on January 9, 2024, WCCB filed a petition to involuntarily terminate Father's parental rights (TPR petition) to Child, pursuant to 23 Pa.C.S.A. § 2511(a)(2), (8), and (b). Specifically, WCCB alleged "that Father has displayed a continued inability and incapacity to properly care for Child's

needs and welfare." TPR Petition, 1/9/24, Appx. 1, at 1 (unpaginated). WCCB averred that "Father has been provided the tools and assistance needed to remedy Father's parenting deficits[;] however, it appears that Father is incapable of doing so." *Id.*

The matter proceeded to an evidentiary hearing on May 16, May 30, and July 11, 2024. Father was present, and represented by counsel. Child was not present, but was represented by a guardian *ad litem*, who indicated there was no conflict between Child's legal and best interests. N.T., 5/16/24, at 2.

Relevantly, WCCB presented the testimony of Carol Patterson, M.Ed. (Ms. Patterson), a licensed psychologist; Carol Hughes, M.A. (Ms. Hughes), a licensed psychologist; Tiffany Mazary (Ms. Mazary), a visitation supervisor for the Children's Institute; and Susan Reese (Ms. Reese), a caseworker for WCCB. Father testified on his own behalf, and presented the testimony of Ben Yaroch (Mr. Yaroch), licensed clinical social worker and psychotherapist; and C.B., Father's mother. Additionally, the parties stipulated to the admission of Ms. Ferguson's testimony from the January 10, 2024, permanency review hearing. *See* N.T., 5/30/24, at 126 (wherein the transcript of Ms. Ferguson's testimony was admitted as Exhibit 9).

We previously summarized Ms. Ferguson's testimony, in relevant part, as follows:

> Ms. Ferguson testified that she began "doing supervised therapeutic visits" with Child and [Father], "out of a concern for the behaviors that were occurring at [Child's] daycare following visits with [Father,] and occurring in the foster home following

visits with [Father]." [N.T., 1/10/24,] at 34. Ms. Ferguson emphasized [her] "concern about what was going on at the visits that might be triggering Child's behaviors." *Id.* Ms. Ferguson "conducted nine therapeutic supervised visits from August 23rd to December 27th[, 2023]." *Id.* at 36. ….

Ms. Ferguson described [Father] as having a "dismissive" and "egocentric ... parenting style," focused on "meeting his own needs and wishes, and that is incredibly harmful to Child." *Id.* at 37, 40. She stated that [Father] "becomes increasingly frustrated. He gets mad. He really doesn't want to incorporate parenting suggestions. He doesn't like the suggestions, which is concerning." *Id.* at 47.

Ms. Ferguson explained that she was "so disturbed" by [Father] "ignoring" Child's feelings "to meet his own needs and wishes." *Id.* at 37. … According to Ms. Ferguson, [Father's] actions "reinforced Child's fears that her needs aren't met when she's made to do things that are against her wishes." *Id.* at 39-40. Ms. Ferguson stated that [Father] "triggers the trauma." *Id.* at 40.

Ms. Ferguson also testified that [Father] "had a difficult time" with community-based visits…. *Id.* at 41. She stated that when [Father] and Child were at an indoor playground at Burger King, [Father] had to be "redirected" 17 times, 9 of which "were safety issues." *Id.* at 41; *see also id.* at 81 ….

On another occasion, a visit occurred at a "family fun center," where [Father] "lost Child three times because he was preoccupied with playing his own games." *Id.* at 42. … Ms. Ferguson also recounted an "ongoing issue" of [Father] "giving Child stuff, claiming to give her stuff, and then taking it away," and Child repeatedly expressing that she did not want to visit [Father] and "wanted to go home" to her foster parents. *Id.* at 43-44.

Ms. Ferguson relayed that she "was very careful to observe Child at the daycare[,]" when Child would go to daycare directly after visits with [Father]. *Id.* at 45. She stated that Child exhibited "increased hitting, biting, punching, destroying property, defiance, pushing other kids; she won't share; she takes their toys." *Id.* [Ms. Ferguson] also testified that "with the

- 5 -

exceptions of afternoons following visits with [Father], Child continued to increase positive behaviors." *Id.*

Ms. Ferguson stated that she "worked very, very closely" with Child and understood [Child's] behavior. *Id.* at 46. [Ms. Ferguson] testified that during a therapy session on October 3, 2023, Child showed an "indication of attachment" to her foster parents. *Id.* Pertinently, the Agency's counsel asked Ms. Ferguson:

Q. If Child is required or forced to continue ... with visits with [Father], ... does this pose a grave threat to her ability to proceed with forming attachments?

A. Absolutely. If Child continues to be subjected to these visits with [Father], it will impair her ability to form healthy attachments. And then if she does not obtain healthy attachments, she will be impaired socially, physiologically, [and] neurobiologically, which will greatly increase her likelihood to develop psychopathology …. And again, we see those impairments now. We see them decreasing where [Child's] needs are getting met at the foster home. We're seeing them decrease at the daycare ....

*Id.* at 47-48.

….

Ms. Ferguson testified that visitation with [Father] poses a grave threat to Child's "ongoing mental, physical and emotional health." *Id.* at 81. ….

*Int. of S.S.*, 480 WDA 2024 (unpublished memorandum at 8-11) (brackets omitted).

At the TPR hearing, Ms. Patterson testified concerning Father's psychological and parenting evaluation, which she performed on August 4, 2021. N.T., 5/16/24, at 27. Ms. Patterson testified that Father self-reported diagnoses of autism and ADHD. *Id.* at 28. Father further advised Ms.

Patterson that he had a history of issues related to anger, and suicidal and homicidal ideations that resulted in several in-patient psychiatric commitments from childhood into early adulthood. *Id.* at 28-30. Ms. Patterson testified that Father's responses to psychological testing "were consistent with mental health diagnoses of schizoaffective disorder, bipolar type[;] intermittent explosive disorder[;] and paranoid personality disorder." *Id.* at 36. Ms. Patterson agreed that, based on Father's history of mental illness, Father's psychological diagnoses "cause[d] concern with [Father's] parenting abilities[.]" *Id.* Ms. Patterson recommended parenting services, individual therapy, and a psychiatric evaluation. *Id.*

Ms. Patterson next testified concerning bonding assessments she conducted on November 16, 2022, between Father and Child, and foster parents and Child. *Id.* at 38, 54. Based upon her observations and professional experience, Ms. Patterson opined that Child "had formed a strong bond and attachment with" foster parents, and "had no bond and attachment with" Father. *Id.* at 60. Ms. Patterson testified that Child would suffer no detrimental effects from the termination of Father's parental rights, but agreed that removal of Child from foster parents "at this point in time might bar [Child] from ever being able to form healthy attachments again[.]" *Id.* at 66, 95.

Ms. Hughes testified concerning a forensic psychological/psychosexual risk assessment she conducted on Father on March 27, 2022. *Id.* at 147. Ms.

Hughes explained that she began her evaluation by discussing Father's history in the juvenile justice system. *Id.* at 148. Father reported to Ms. Hughes a lengthy history of out-of-home placements as a minor, including "several group home placements[,] residential treatment places[,]" and in-patient mental health commitments, until Father eventually aged out of juvenile court supervision at 21 years old. *Id.* at 148-49.

Ms. Hughes testified as follows concerning her questioning of Father about his prior juvenile offenses:

> [W]hen I [questioned Father] about the juvenile [adjudications], because the data that I have is that there are three identified [minor] victims of sexual assault, each of those victims having a specific list of charges that were charged relative to that victim, [Father's] statement was, "one victim, three charges. I don't know why they keep trumping up three victims. I don't know what they – I don't know how they F-ed that up." And I said, well, this is what my papers say. This is what I have in documentation. [Father stated,] "I don't care what the paper says. That is falsified by the therapist."

*Id.* at 157 (paragraph break omitted; quotation marks added); *see also id.* at 190 (Ms. Hughes confirming that Father's group home records indicated that Father admitted to sexually assaulting "six[] human victims, and two canine victims[.]"). Ms. Hughes explained that, based on the information supplied by Father, Father did "not score high on [the psychopathy] test." *Id.* at 158.

Regarding Father's recidivism risk, Ms. Hughes testified that Father scored "moderate to moderate[-]low based on the data that was available[.]" *Id.* at 162-63. Ms. Hughes stated her concerns regarding Father's use of

"escape strategies" when encountering situations that might potentially put him at risk of reoffending, such as staying away from playgrounds and leaving a mall if he saw a child unattended. *See id.* at 160-63, 176-77. Although Ms. Hughes requested that Father schedule a follow-up evaluation after he began sex offender-specific treatment, Father failed to do so. *Id.* at 182-83.

Ms. Mazary testified regarding the parenting services the Children's Institute offered Father, and to her observations during Father's supervised visitation with Child. N.T., 5/30/24, at 58. Ms. Mazary explained that the Children's Institute offered Father a parenting curriculum "every time it was available." *Id.* at 75. Although Father had the option to participate in-person or virtually, he did not complete the required homework and "did not have interest in" completing parenting courses. *Id.* at 76. Father failed to complete parenting instruction, despite the trial court repeatedly ordering him to do so. *See* Order, 11/1/21, at 4; Order, 5/2/22, at 4; Order, 9/21/22, at 4; Order, 1/18/23, at 5; Order, 7/5/23, at 4; Order, 3/22/24, at 4.

Ms. Reese testified as WCCB's caseworker for the family. N.T., 5/30/24, at 127. Ms. Reese explained that after Father had been offered parenting instruction for over two years, WCCB "decided it was time to see if [Father was] able to parent appropriately without constant step-ins and reminders." *Id.* at 139. Ms. Reese testified that WCCB also made this decision based on Father's frustration with the frequency of the Children's Institute's interventions, "because they were stepping in and doing the bulk of [the

parenting].” *Id.* at 140. As a result, on July 5, 2023, WCCB “step[ped] back” parenting intervention “somewhat” during Father's supervised visits with Child, and chose to “intervene more for safety concerns.” *Id.* at 139-40, 156. Although Child's dependency case spanned more than two years at this point, WCCB continued to have concerns regarding Father's ability to parent Child, and Father's continued failure to “utiliz[e] any learned materials.” *Id.* at 155, 159. Ms. Reese agreed that, “based on what [WCCB has] seen so far with all of the services in place[,]” the continuation of services would not result in “reunification within the foreseeable future.” *Id.* at 220.

Ms. Reese testified that one of Father's court-ordered goals was to complete a mental health examination and comply with mental health recommendations. *Id.* at 151-52. Father completed a mental health examination with Dr. Rodney Williams, but did not comply with all recommended mental health services. *Id.* at 152. Ms. Reese testified that Father completed an anger management course, but “struggle[d] to incorporate any of that learned material into his everyday living.” *Id.* at 153.

Ms. Reese further testified that she was unable to determine whether Father had “stable and appropriate housing” for Child. *Id.* at 162. Ms. Reese explained that she spoke with Father on numerous occasions to arrange a visit of Father's residence, but, on each occasion, Father rebuffed her efforts. *Id.* 162-64; *see also id.* at 163 (Ms. Reese testifying she left Father “twenty-two messages, trying to see his place.”). Concerning Father's contact with WCCB

throughout the course of the dependency case, Ms. Reese stated Father was often nonresponsive. *See id.* at 168 (Ms. Reese testifying she had "documentation of eighty [text] messages I sent where [Father] did not respond" over a two-and-a-half-year period).

At the TPR hearing, Father called Mr. Yaroch to testify on his behalf. Mr. Yaroch confirmed he was Father's "treating therapist for a number of years[.]" N.T., 5/30/24, at 3. Mr. Yaroch testified that, based upon the information available to him, he was not aware of any "evidence to suggest a return to harmful sexual behaviors …." *Id.* at 4. Mr. Yaroch noted that Father had made progress during their sessions, but that his treatment with Father was discontinued in March 2023, after WCCB stopped providing Father with transportation. *Id.* at 4, 7.

On cross-examination, Mr. Yaroch confirmed that, during their therapy sessions, Father admitted to sexually assaulting several victims as a juvenile. *Id.* at 36. Mr. Yaroch further agreed that Father's blanket denials of past sexual victimization, and claims that his records were falsified, were "cause for concern." *Id.* at 37.

At the conclusion of the TPR hearing, the trial court took the matter under advisement. On August 1, 2024, the trial court filed an opinion and order terminating Father's parental rights to Child, pursuant to 23 Pa.C.S.A. § 2311(a)(2) and (b). Father filed a timely notice of appeal and contemporaneous Pa.R.A.P. 1925(a)(2)(i) concise statement. On September

3, 2024, the trial court filed a Rule 1925(a) opinion indicating that it relies on the rationale set forth in its August 1, 2024, opinion and order.

Father raises the following issues:

I. Whether the [trial] court erred in terminating Father's parental rights, given that the trial court did not consider the evidence with regard to the fact that homicide charges, of a child, have been filed against the foster parents with whom Child [] was placed when the alleged homicide of a child occurred? ….

II. Whether the [trial] court erred in finding by clear and convincing evidence that [WCCB] met its burden as to terminating the parental rights of Father under 23 Pa.C.S.[A.] § 2511(a)(2)?

III. Whether the [trial] court erred in finding by clear and convincing evidence that [WCCB] met its burden under 23 Pa.C.S.[A.] § 2511(b) that the best interests of [] Child are met by terminating Father's parental rights?

IV. Whether the [trial] court erred in finding that visits with Father create a grave risk of emotional harm for [] Child, an[d] erred in ordering that Father's visits are suspended? ….

V. Whether the [trial] court erred in finding that [] Child's placement is the least restrictive placement that meets the needs of [] Child and that there is no less restrictive alternative available? ….

Father's Brief at 4-6 (issues reordered; some capitalization and punctuation modified; citations omitted).

We review the termination of parental rights for an abuse of discretion. *See In the Int. of K.T.*, 296 A.3d 1085, 1104 (Pa. 2023). This standard requires appellate courts to

accept the findings of fact and credibility determinations of the trial court if they are supported by the record. If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion. As has

been often stated, an abuse of discretion does not result merely because the reviewing court might have reached a different conclusion. Instead, a decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will.

As [the Pennsylvania Supreme Court] discussed in [**In re:**] **R.J.T.**, [9 A.3d 1179, 1190 (Pa. 2010)], there are clear reasons for applying an abuse of discretion standard of review…. [U]nlike trial courts, appellate courts are not equipped to make fact-specific determinations on a cold record, where trial judges are observing the parties during the relevant hearing and often presiding over numerous other hearings regarding the child and parents. **R.J.T.**, 9 A.3d at 1190. Therefore, even where the facts could support an opposite result, as is often the case in dependency and termination cases, an appellate court must resist the urge to second guess the trial court and impose its own credibility determinations and judgment; instead, we must defer to the trial judges so long as the factual findings are supported by the record and the court's legal conclusions are not the result of an error of law or an abuse of discretion.

*In re Adoption of S.P.*, 74 A.3d 817, 826-27 (Pa. 2012) (some citations omitted).

In his first issue, Father claims that evidence concerning "the fact that homicide charges, of a child, have been filed against the foster parents with whom Child [] was [originally] placed[,]" "was not allowed in by the [t]rial [c]ourt at the" TPR hearing. Father's Brief at 45. As a result, Father argues[,] the trial court "failed to consider how this fact may have impacted [] Child's ability to bond with [Father,]" and "did not consider whether any specific services were put in place or needed to be put in place to deal with this completely inappropriate placement by [WCCB.]" *Id.*

WCCB responds:

> While it is true that Child's initial placement was terminated due to an alleged homicide of a child in that home, Father did not make any effort to introduce evidence during the [TPR hearing,] which would substantiate any effect that incident would have had on Child. Father's only attempt at discussing that placement came in the way of, first, [] Father stat[ing] the only time he saw marks on Child was when she was with that family[, N.T., 7/11/24, at 14,] and, next, [] Father [] referenc[ing] the placement when asked if he would be comfortable in placing Child in any home that was not assessed for safety[, *id.* at 52, 53]. The [t]rial [c]ourt, therefore, could not have disallowed testimony at termination proceedings improperly when no such testimony was attempted.

WCCB Brief at 25-26 (footnotes omitted).

Our review discloses that at the TPR hearing, Father never attempted to question any witness, or present any evidence, concerning charges allegedly filed against Child's first foster parents. Father correctly observes that he raised this issue in his cross-examination of Ms. Ferguson at the January 10, 2024, permanency review hearing. Father's Brief at 46; *see also* Exhibit 9, at 73. However, the transcript of Ms. Ferguson's testimony confirms that the trial court **permitted** Father to question Ms. Ferguson concerning the first foster parents' criminal charges, **over WCCB's relevance objection.** *See* Exhibit 9, at 73. As Father's argument lacks support in the record, his first issue merits no relief.

In his second issue, Father argues the trial court improperly terminated his parental rights pursuant to 23 Pa.C.S.A. § 2511(a)(2). Father's Brief at 32. Father argues WCCB "failed to provide services or stopped services in many ways, including stopping visits, stopping hands-on parenting, and stopping transportation to [Father's] therapy sessions…." Father's Brief at 40.

Father maintains that he "made progress during every Review Period, and was very compliant with services throughout the history of the case." **Id.** As a result, Father contends "that termination was premature in this case, and [WCCB] did not establish an inability of Father to care for [] Child that cannot or will not be remedied." **Id.** at 42.

Termination of parental rights is governed by Section 2511 of the Adoption Act, which requires a bifurcated analysis:

> Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in [Section] 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to [Section] 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child. One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond.

**Matter of Adoption of L.C.J.W.**, 311 A.3d 41, 48 (Pa. Super. 2024) (citation omitted). "The standard of 'clear and convincing' evidence is defined as testimony that is so clear, direct, weighty, and convincing as to enable the trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue." **In re Adoption of C.L.G.**, 956 A.2d 999, 1004 (Pa. Super. 2008) (*en banc*) (citation omitted).

Instantly, we examine Father's challenge pursuant to Section 2511(a)(2),[4] which provides:

> **(a) General rule.--**The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:
>
> * * *
>
> (2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the condition and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.

23 Pa.C.S.A. § 2511(a)(2).

To satisfy the requirements of Section 2511(a)(2), the petitioner must prove "(1) repeated and continued incapacity, abuse, neglect or refusal; (2) that such incapacity, abuse, neglect or refusal caused the child to be without essential parental care, control or subsistence; and (3) that the causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied." *In re A.H.*, 247 A.3d 439, 443 (Pa. Super. 2021) (citation omitted). Grounds for termination under this subsection "are not limited to affirmative misconduct, but concern parental incapacity that cannot be remedied." *Id.*

---

[4] The trial court found that WCCB failed to establish grounds for termination of Father's parental rights under Section 2511(a)(8). *See* Trial Court Opinion, 8/1/24, at 27 (unpaginated) (concluding that Child "was never in Father's care[,] and thus was not removed from Father's care by [WCCB].").

- 16 -

"[S]ubsection (a)(2) does not emphasize a parent's refusal or failure to perform parental duties, but instead emphasizes the child's present and future need for essential parental care, control or subsistence necessary for his physical or mental well-being." *In re Z.P.*, 994 A.2d 1108, 1117 (Pa. Super. 2010) (citation omitted). "Parents are required to make diligent efforts toward the reasonably prompt assumption of full parental duties." *In re C.M.K.*, 203 A.3d 258, 262 (Pa. Super. 2019). However, "**while 'sincere efforts to perform parental duties,' can preserve parental rights under subsection (a)(1), those same efforts may be insufficient to remedy parental incapacity under subsection (a)(2)**." *In re Z.P.*, 994 A.2d at 1117 (citation omitted; emphasis added). We have recognized that a child's life "cannot be held in abeyance while a parent attempts to … assume parenting responsibilities. The court cannot and will not subordinate indefinitely a child's need for permanence and stability to a parent's claims of progress and hope for the future." *In re Adoption of R.J.S.*, 901 A.2d 502, 513 (Pa. Super. 2006).

Here, the trial court cogently summarized its findings with respect to Section 2511(a)(2):

> Father's housing was a major barrier during the course of this dependency action. Every time the Agency would arrange to see Father's home, Father would cancel or not allow the provider access to his home. On July 17, 2024, **after the** [**TPR**] **hearing concluded**, the Agency was permitted to assess Father's home. While Father's home was deemed cluttered yet appropriate, it took Father three years and the [TPR hearing] for Father to comply with this court[-]ordered directive.

The court takes note of Father's successful completion of his anger management [treatment/goals]. The court commends Father for his progress in sexual offender's treatment with Mr. Yaroch and notes the lack of transportation by [WCCB] as the reason for Father being unable to make any additional progress with this service. Father was not compliant with his mental health [treatment/goals] although[,] at times[, Father] demonstrated a willingness to work through this issue. Father was unable to demonstrate any substantial comprehension of the parenting curriculum and was inconsistent with his overall attendance with this service. Father demonstrated his inability to keep [] Child safe during visits and continuously struggled with not only prioritizing the needs of [] Child[,] but also with [respecting] Child's boundaries. While the court notes the hardship of visits being suspended[ following its finding that continued visitation posed a grave risk of harm to Child] …, the court had an obligation to protect the needs and welfare of … Child[,] which it abided by in suspending visits.

… Father['s] home was eventually deemed to be appropriate for [] Child[,] but based upon the concerns of [Ms.] Hughes and Mr. Yaroch stemming from Father's denial of his sexual offender history, [] Child would never be able to be unsupervised [by Father]. Aside from … Father's progress with anger management and his sexual offender[] treatment, Father has not demonstrated his ability to parent … Child[,] nor has Father displayed any ability to remedy the reasons for [] Child being in [placement]. As such, this court finds that the Agency did satisfy [its] burden under Section 2511(a)(2).

Trial Court Opinion, 8/1/2024, at 25-26 (unpaginated) (some capitalization modified; emphasis added).

Our review confirms the trial court's findings are supported by the record, and its conclusion is sound. The record confirms that, in the 30 months between the establishment of Father's paternity and the filing of WCCB's TPR petition, Father failed to 1) complete a court-ordered parenting curriculum, 2) comply with mental health treatment recommendations, or 3) provide

evidence of appropriate housing for Child. *See* N.T., 5/30/24, at 76, 152, 162. Although the record supports Father's claim that, in early 2024, WCCB discontinued the transportation services it had previously offered Father, we have stated: "The agency is not required to offer services indefinitely, where a parent is unable to properly apply the instruction provided." *In re R.M.G.*, 997 A.2d 339, 347 (Pa. Super. 2010) (citation omitted); *see also In re D.C.D.*, 105 A.3d 662, 672 (Pa. 2014) (stating that the Adoption Act does not "require[] a court to consider the reasonable efforts provided to a parent prior to termination of parental rights[,]" but noting that the "absence of reasonable efforts may be relevant to a court's consideration of both the grounds for termination and the best interests of the child." (citation omitted)).

Accordingly, we discern no error in the trial court's determination that WCCB proved, by clear and convincing evidence, that termination of Father's parental rights was warranted under Section 2511(a)(2). *See S.P.*, 74 A.3d at 827 ("[A]n appellate court must … defer to the trial judges so long as the factual findings are supported by the record and the court's legal conclusions are not the result of an error of law or an abuse of discretion."). Father's second issue merits no relief.

In his third issue, Father challenges termination of his parental rights under 23 Pa.C.S.A. § 2511(b). Father claims the trial court "did not make a finding [as to] whether the severing of a bond between Father and Child would be detrimental to [] Child." Father's Brief at 43. Father further contends that

since the [trial court's] best interest finding is based on the [c]ourt's perceived lack of progress by [Father], and not on a lack of bond or lack of harm of severing a bond, it is clear that this Honorable Court should reverse the termination of Father's parental rights[.]

*Id.* at 45.

When the trial court finds grounds for termination under Section 2511(a), it must separately consider a child's needs and welfare:

**(b) Other considerations.--**The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. ….

23 Pa.C.S.A. § 2511(b).

"Notably, courts should consider the matter from the child's perspective, placing [their] developmental, physical, and emotional needs and welfare above concerns for the parent." *K.T.*, 296 A.3d at 1105. Courts must also "discern the nature and status of the parent-child bond, with utmost attention to the effect on the child of permanently severing that bond." *Id.* (citation omitted). However, "the parental bond is but one part of the overall subsection (b) analysis." *Id.* at 1113.

The Section 2511(b) inquiry must also include consideration of other important factors such as: the child's need for permanency and length of time in foster care …; whether the child is in a preadoptive home and bonded with foster parents; and whether the foster home meets the child's developmental, physical, and emotional needs, including intangible needs of love, comfort, security, safety, and stability.

- 20 -

*Id.* (footnote and citations omitted).

Instantly, contrary to Father's claim that the trial court made no factual findings related to Child's bonds, the trial court specifically stated in its opinion that

> [Ms.] Patterson confirmed for the court that too much time had elapsed[,] thus making it highly unlikely for [] Child and Father to demonstrate a shared bond. Father was unable to quickly form an attachment with [] Child and it was too late for [] Child to form an attachment to Father. It was [Ms.] Patterson's professional opinion that if the bond that [] Child shares with [her current] foster parents were to be severed, it could impact [] Child's ability to form attachments forever, thus creating a future risk of reactive attachment disorder in [] Child.

Trial Court Opinion, 8/1/24, at 23 (unpaginated) (some capitalization modified).

The trial court continued:

> Father at times through the history of this case has demonstrated his ability to make progress and to comply with [WCCB]. Father was consistent with attending supervised visits with Child. Father did evidence ongoing struggles with retaining parenting concepts and with providing adequate supervision to [] Child. Father evidences an inability to recognize when [] Child is uncomfortable and is not cognizant of [] Child's boundaries.
>
> Father had been provided with opportunit[ies] to comply with [his] parenting [goals], even being provided with the option for virtual participation, but chose not to complete this offered service. Father did not follow through with addressing his mental health [goals,] despite [] multiple opportunities to do[ so]. Father himself testified that his anger continues to be a struggle despite his having successfully complete[d] anger management [treatment]. The main issue is that Father [has] not fully cooperated with [service] providers. Father has not been fully transparent regarding his past history that prompted the ordering of sexual offender's treatment through Yaroch Counseling. Concerns still remain with respect to Father's potential to

- 21 -

reoffend. Thus[,] despite being provided with three years to address the ongoing concerns of [WCCB], Father has been unable or unwilling to make the progress necessary for reunification.

… [Father was] provided with an abundance of services[,] but due to a lack of willingness to engage in services or a lack of demonstrating any substantial progress, termination of [Father's] parental rights would best serve the needs and welfare of [] Child.

*Id.* at 29 (unpaginated) (some capitalization modified).

We agree with the reasoning and determination of the trial court, as it is supported by the record and free of legal error. ***See S.P.***, 74 A.3d at 826-27. The record amply supports the trial court's conclusion that termination of Father's parental rights is in the best interest of Child. In addition to the concerns the trial court highlighted regarding Father's ability to parent and attend to Child unsupervised, Ms. Patterson testified at length concerning Father and foster parents' bond with Child, opining that Child "had formed a strong bond and attachment with" foster parents, and "had no bond and attachment with" Father. N.T., 5/16/24, at 60. Thus, the trial court acted within its discretion when it credited the testimony of Ms. Patterson. ***See L.C.J.W***, 311 A.3d at 48 ("It is the province of the orphans' court to assess credibility and resolve any conflicts in the evidence, and in doing so it is free to believe all, part, or none of the evidence presented." (citation and quotation marks omitted)). Accordingly, Father's third issue entitles him to no relief.

Finally, we consider Father's remaining two issues together. Father claims the trial court erred by 1) suspending Father's visitation with Child after determining continued visitation posed a grave risk of harm to Child; and 2)

finding Child's placement with foster parents was the least restrictive placement, and that there was no less restrictive alternative available. Father's Brief at 48, 57. Father acknowledges that these identical issues were decided against him in ***Int. of S.S.***, ***supra***. ***Id.*** at 49, 58. However, notwithstanding this procedural posture, Father asserts that these issues are reviewable by this Court. ***Id.*** (citing ***In Int. of N.M.***, 186 A.3d 998, 1008 (Pa. Super. 2018) ("[B]ecause the trial court has terminated [the p]arents' parental rights to N.M., the entire record from the permanency hearings … is now reviewable on appeal from the [trial] court's termination decrees." (citation omitted)).

Upon review, we conclude that we are precluded from reviewing Father's claims by the doctrine of law of the case. In ***Int. of S.S.***, this Court determined that the trial court did not abuse its discretion in suspending Father's visitation with Child. ***Int. of S.S.***, 480 WDA 2024 (unpublished memorandum at 14). We likewise determined that the trial court did not abuse its discretion in concluding Child's foster parents were "the least restrictive placement that met the needs of the Child." ***Id.*** (unpublished memorandum at 17) (citation omitted).

"Whether the law of the case doctrine precludes review in a given situation is a pure question of law. Therefore, our standard of review is *de novo*." ***Commonwealth v. Lancit***, 139 A.3d 204, 206 (Pa. Super. 2016) (citations omitted; some capitalization modified).

- 23 -

Our Supreme Court has explained:

> [T]he "law of the case" doctrine … refers to a family of rules which embody the concept that a court involved in the later phases of a litigated matter should not reopen questions decided by another judge of that same court or by a higher court in the earlier phases of the matter.  Among the related but distinct rules which make up the law of the case doctrine are that … **upon a second appeal, an appellate court may not alter the resolution of a legal question previously decided by the same appellate court** ….
>
> The various rules which make up the law of the case doctrine serve not only to promote the goal of judicial economy (as does the coordinate jurisdiction rule) but also operate (1) to protect the settled expectations of the parties; (2) to insure uniformity of decisions; (3) to maintain consistency during the course of a single case; (4) to effectuate the proper and streamlined administration of justice; and (5) to bring litigation to an end.

*Commonwealth v. Starr*, 664 A.2d 1326, 1331 (Pa. 1995) (emphasis added; internal citations omitted).

Based on the foregoing, we are bound by this Court's prior holdings disposing of Father's remaining claims.  We recognize that

> [a] prior decision may be departed from in exceptional circumstances such as where there has been an intervening change in the controlling law, a substantial change in the facts or evidence giving rise to the dispute in the matter, or where the prior holding was clearly erroneous and would create a manifest injustice if followed.

*Commonwealth v. Santiago*, 822 A.2d 716, 724 (Pa. Super. 2003) (citation and quotation marks omitted).  Here, however, Father has not alleged, nor do we find, that any of the exceptions to the law of the case doctrine apply.

Accordingly, we cannot reconsider the identical arguments raised by Father, and decided by this Court, in ***Int. of S.S.***, ***supra***.[5]

Order affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

DATE: 01/28/2025

---

[5] Even if we were not barred from reviewing Father's remaining claims by the law of the case doctrine, we agree with, and would adopt, the cogent analysis set forth in ***Int. of S.S.***, ***supra***.